UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

FREDERICK FLETCHER,

      Defendant.

Case No. 17-20156
Hon. Mark A. Goldsmith

_____/

UNITED STATES OF AMERICA,

      Plaintiff,

v.

LOUIS LOVELL HOOPER,

      Defendant.

Case No. 17-20741
Hon. Mark A. Goldsmith

_____/

**OPINION & ORDER
(1) DISMISSING PETITIONS ALLEGING VIOLATIONS OF SUPERVISED RELEASE
CONDITIONS (No. 17-20156, Dkt. 31; No. 17-20741, Dkt. 25) AND (2) DENYING AS
MOOT FLETCHER'S MOTION TO DISMISS (No. 17-20156, Dkt. 41)**

Defendant Frederick Fletcher was previously sentenced to 36 months' imprisonment, to be

followed by a three-year term of supervised release, for possessing with intent to deliver crack

cocaine. Fletcher Judgment (No. 17-20156, Dkt. 24). Fletcher began his term of supervised

release on March 22, 2019. Defendant Louis Hooper was previously sentenced to 24 months'

imprisonment, to be followed by a three-year term of supervised release, for possessing with intent

to distribute and distributing crack cocaine. Hooper Judgment (No. 17-20741, Dkt. 22). Hooper

began his term of supervised release on November 10, 2020. Probation Officer Mark Burchell has been supervising Fletcher since March 2019 and Hooper since February 2021.

This matter is now before the Court on Burchell's petition alleging violations of supervised release conditions committed by Fletcher (No. 17-20156, Dkt. 31) and Hooper (No. 17-20741, Dkt. 25). The petitions largely relate to a shooting incident on March 19, 2021, in which Defendants' vehicle was fired upon by unknown assailants. Defendants were arrested based on the warrants issued following the filing of the supervised release violation petitions. On April 30, 2021, the Court held a hearing to determine whether Defendants violated the conditions of their supervised release. For the reasons that follow, the Court finds that the Government has not proven by a preponderance of the evidence that Defendants violated their supervised release conditions. Accordingly, the petitions are dismissed, and Defendants must be released from custody immediately. Because the petitions are dismissed, the Court denies as moot Fletcher's motion to dismiss two of the alleged violations of his supervised release (No. 17-20156, Dkt. 41).

## I.  BACKGROUND

### A.  Petitions for Violations of Supervised Release Conditions

The petition filed in Fletcher's case alleges that he committed six violations of his supervised release conditions: (i) commission of a crime, to wit, possession of firearms on the night of March 19; (ii) untruthful answers to questions by his probation officer about the March 19 incident; (iii) lack of full-time employment; (iv) interaction or communication with someone engaged in criminal behavior—Antjuan Roby—who was arrested for an incident involving home invasion on April 10, 2020, which was unrelated to the March 19 incident; (v) possessing or having access to a firearm, to wit, the firearms allegedly discovered by police on March 19; and (vi) failure

2

to follow the instructions of his probation officer, to wit, failure to follow Burchell's instruction to address Fletcher's outstanding traffic warrants. Fletcher Petition at 2–4 (No. 17-20156, Dkt. 31).

The petition filed in Hooper's case alleges that he committed three violations of his supervised release conditions: (i) untruthful answers to questions by his probation officer about the March 19 incident; (ii) lack of full-time employment; and (iii) having access to a firearm. Hooper Petition at 2–3 (No. 17-20741, Dkt. 25).

## B. Supervised Release Violation Hearing[1]

Three types of evidence were presented at the April 30, 2021 hearing: (i) video, (ii) witness testimony, and (iii) photographs. Each category of evidence is discussed in turn.

### i. Video Evidence

The Government submitted three videos taken from security cameras. The first video was taken from the Viking Motel in Detroit. The Motor City Casino is visible from the camera's vantage point, appearing to be just a couple blocks away from the motel. The motel's video captured the moment of the shooting incident that occurred on March 19. The time stamp indicates that the shooting occurred at 8:48 p.m. The video shows a car—a white car with a red hood—driving on a street next to the motel and stopping at an intersection. Defendants were in this car, with Fletcher in the driver's seat and Hooper in the front passenger seat. Shortly after Defendants' car came to a stop, a second car drove up from behind. Bullets were fired from the passenger side of the second car into Defendants' car. There was no return fire from Defendants' car. Seconds after the bullets were fired from the second car, Defendants drove off.

---

[1] One hearing was held as to both Defendants. The same hearing transcript was docketed in both cases (No. 17-20156, Dkt. 42; No. 17-20741, Dkt. 38). For ease of reference, citations to the hearing transcript in this opinion utilize the page identification (PageID) of the transcript docketed in Fletcher's case (No. 17-20156, Dkt. 42).

The second and third videos were taken from Detroit Receiving Hospital. The videos show Defendants' white car with the red hood arriving at the emergency room ramp of the hospital at 8:54 p.m. Fletcher exited the driver side of the car and went into the hospital to retrieve a wheelchair. Fletcher helped Hooper get into the wheelchair from the passenger side of the car. A hospital security officer wheeled Hooper into the hospital. A second security officer approached Fletcher next to the car. Fletcher was standing on the driver side of the car but, as the officer approached, Fletcher moved to the passenger side of the car. The officer opened the driver-side car door and looked into the car. Fletcher then drove away from the hospital entrance.

### ii. Witness Testimony

Three witnesses testified during the hearing: (i) John Brewer, a security officer at Detroit Receiving Hospital; (ii) Stevie Posey, a detective for the Detroit Police Department; and (iii) Burchell, Defendants' probation officer.[2] Each witness's testimony is discussed in turn.

### a. Brewer

Brewer testified that, while working at the hospital on the night of March 19, he was notified that a gunshot victim had arrived at the hospital. Hr'g Transcript at PageID.119. Brewer walked out of the hospital and saw a white car with a red hood that had two bullet holes in the windshield directly in front of the driver seat. Id. at PageID.119, 123. Brewer approached Fletcher, who "proceeded to walk around to the passenger door." Id. at PageID.120. From the passenger side, Fletcher grabbed something from the console of the car, which Brewer believed to be marijuana. Id. Brewer attempted to ask Fletcher about Hooper, but Fletcher did not "say[] much." Id. While Brewer was standing on the driver side of the car with the driver door open, he

---

[2] Pursuant to the parties' agreement, the Court ordered that Posey's testimony was only admitted as against Hooper, not at as against Fletcher. Hr'g Transcript at PageID.172–174.

could see inside the front compartment of the car and he did not see any firearms therein. Id. at PageID.125. Fletcher stated that he needed to go and drove away from the hospital. Id. at PageID.120–121.

Brewer observed Fletcher pull into an apartment complex directly across from the hospital. Id. at PageID.125–126. Although Brewer testified that nothing was obstructing his view, he also testified that it was dark, and that Fletcher was approximately 50 to 60 yards away. Id. at PageID.127. Initially, Brewer testified that Fletcher's car's headlights "[lit] up the area" and that Brewer saw Fletcher leave the car, run to the left along the side of the apartment building, stay there for five to ten seconds, run back to the car, and then back the car up into a parking spot. Id. at PageID.126. However, Brewer later testified that Fletcher was jogging—not running—and that Fletcher jogged "more diagonal to the apartment wall"—rather than alongside it. Id. at PageID.139. Thus, Fletcher ran away from the headlights into the darkness. Id. at PageID.140. Brewer did not see anything in Fletcher's hands and did not see any weapons. Id. In fact, Brewer testified that he could not see anything that Fletcher was doing; rather, Brewer could only see Fletcher's movement. Id. Further, Brewer did not see Fletcher reach for anything—including reaching for anything in the backseat—before leaving the car and jogging away from it. Id. at PageID.151. After Fletcher returned to the car and parked it, Brewer did not see Fletcher leave the car; however, when Brewer arrived at the location where the car was parked, Fletcher was not in the vehicle. Id. at PageID.128.

Shortly after Fletcher parked the car, Detroit police officers arrived at the scene. Id. at PageID.126. Brewer and the police officers "proceeded to look in the area where he got out of the vehicle and ran to the side of the apartments." Id. Somewhere in the apartment complex area, they discovered two handguns stacked on top of each other. Id. Brewer testified that he did not

5

actually see Fletcher place any weapons there.  Id. at PageID.140.  Consequently, Brewer could not say why Fletcher had jogged away from the car.  Id.  Brewer did not take any photographs of the handguns and could not recall whether anyone else had done so.  Id. at PageID.147.

### b. Posey

On the night of March 19, Detective Posey went to the hospital to attempt to question Hooper about the shooting.  Id. at PageID.163.  Hooper refused to provide Posey with information.  Id. at PageID.166–167.

### c. Burchell

Fletcher and Hooper each called Burchell to inform him about the incident within days of the incident occurring.  Id. at PageID.178, 184.  Burchell testified that Hooper told him that he was the victim of a shooting that he believed was a robbery; that Hooper was leaving the Motor City Casino; that he believed that he was targeted for winning money at the casino; and that Hooper and Fletcher tried to wave down police officers to help them but were ignored.  Id. at PageID.178.  Fletcher told Burchell the same information and added that as Fletcher and Hooper were leaving the casino, a car pulled up on the side and began firing.  Id. at PageID.185.  However, Burchell later testified that Fletcher told him that the shooting happened near the casino—not as Defendants were leaving the casino.  Id. at PageID.212.

Burchell testified that he believed that Defendants' statements were untruthful for several reasons.  Id.  First, Burchell looked at the motel's video footage and determined that the car pulled behind—not beside—Fletcher's car.  Id. at PageID.186.  Second, in reviewing this footage, Burchell did not see the perpetrators approach Fletcher and Hooper's car in an effort to rob them.  Id. at PageID.188.  Third, also in reviewing this footage, Burchell did not see any indication that Fletcher was coming from the casino.  Id. at PageID.194.  Fourth, Burchell spoke with Detroit

police officers who reviewed footage from street cameras where the shooting occurred; these officers told Burchell that they "did not see any police officers at the time patrolling near Mr. Fletcher and Mr. Hooper's vehicle" or on nearby streets. Id. at PageID.183. However, Burchell acknowledged that the footage showed that the shooting occurred near the casino, that Burchell did not have any evidence that Defendants were not at the casino, that he did not know the route that Defendants took to the hospital, that he did not personally review any traffic camera footage. Id. at PageID.214, 229.

Burchell also testified regarding Fletcher and Hooper's respective employment statuses. Burchell testified that Hooper was unemployed since being released from prison in November 2020. Id. at PageID.195. However, Hooper told Burchell that he was waiting to obtain his driver's license before applying for positions. Id. Burchell testified that Fletcher has not been employed since August 2019. Id. at PageID.196. However, Burchell also acknowledged that Fletcher said that, from August 2019 to March 2020, Fletcher was seeking employment but unable to find anyone hiring. Id. Burchell also acknowledged that Fletcher had informed Burchell before the pandemic that he was employed at a Coney Island restaurant, which had shut down during the pandemic. Id. More recently, Fletcher informed Burchell that he had started working at a landscape company. Id.

Regarding Fletcher's outstanding traffic warrants, Burchell testified that he had instructed Fletcher to take care of the warrants. Id. at PageID.200. Fletcher told Burchell that Fletcher "looked into it and tried to handle it," but Burchell "ha[d] no proof that he actually did." Id. At the same time, Burchell acknowledged that Fletcher "could have made . . . those efforts" and agreed that the process of addressing outstanding traffic warrants could be difficult because of the pandemic. Id. at PageID.226–227.

### iii. Photographic Evidence

Fletcher submitted three photographs. The first is a picture of Fletcher's car parked outside the hospital; the second is a picture of the emergency ramp entrance to the hospital, where Brewer was standing as he watched Fletcher go to the apartment complex across from the hospital; and the third is a picture of the apartment complex in the daytime.

## II. ANALYSIS

The Government has the burden of proving supervised release violations by a preponderance of the evidence. 18 U.S.C. § 3583(e)(3). "Under the preponderance standard, the government must produce evidence to prove the defendant 'more likely than not' committed the violation." United States v. Johnson, 814 F. App'x 970, 972 (6th Cir. 2020) (quoting United States v. Catching, 786 F. App'x 535, 539 (6th Cir. 2019)). Because "revocation hearings are more flexible than a criminal trial" and, therefore, in determining whether the Government has met its burden in demonstrating a supervised release violation, the Court may consider all relevant evidence, including hearsay, "if it is proven to be reliable." United States v. Stephenson, 928 F.2d 728, 732 (6th Cir. 1991).

Each alleged supervised release condition violation is addressed in turn. The Court holds that Government has not shown by a preponderance of the evidence that Defendants violated their conditions of supervised release.

### A. Providing Untruthful Answers to the Probation Officer

The petitions allege that both Fletcher and Hooper provided several pieces of untruthful information to Burchell about the March 19 incident. First, the petitions allege that Defendants falsely represented that they were leaving the casino when the shooting happened. In support of this allegation, Burchell testified that the motel's security footage does not show Defendants

leaving the casino. However, Burchell later testified that Fletcher said that the shooting happened near the casino—not as Defendants were leaving the casino. Hr'g Transcript at PageID.212. Further, as Burchell acknowledged, the motel footage clearly shows that the shooting happened near to the casino. Id. at PageID.229. This makes it entirely possible that Defendants had come from the casino and the motel's security camera simply did not have the proper vantage point to document such. Further, Burchell admitted that he did not have any evidence establishing that Defendants did not come from the casino. Id. The Government thus did not establish that it is more likely than not that Defendants were not coming from the casino when the shooting occurred.

Second, the petitions allege that Fletcher misrepresented that the perpetrator's car pulled up beside Defendants' car rather than behind. In support of this allegation, Burchell testified that the motel's security footage shows that the perpetrator's car pulled behind Defendants' car. However, the footage shows that the shooting happened very quickly and that it was dark outside. And the footage also appears to show that the shots were fired into the side of Defendants' car from the passenger side of the assailants' car. Based on the sum of this evidence, it would have been reasonable for Fletcher to have remembered the bullet shots coming in from the side of the vehicle. At minimum, it is just as probable that Fletcher genuinely remembered the facts about the quick shooting event as he stated them and, therefore, did not intentionally misrepresent to Burchell that the perpetrators shot from the side rather than from behind.

Third, the petitions allege that Defendants falsely stated that they believed they were victims of an attempted robbery. To support this allegation, Burchell testified that, in reviewing the motel's security footage, he did not see the perpetrators approach Fletcher and Hooper in an attempt to rob them. Id. at PageID.188. The Government's position seems to rely on the assumption that, in order to rob someone, the perpetrator must—before doing anything else—

approach the victim. However, robberies do not all follow the same script. Based on the motel footage, it is possible that the perpetrators were attempting to neutralize or intimidate Defendants to facilitate robbing them. Further, the motel footage shows that Defendants quickly drove away just seconds after the shots were fired. Thus, it is highly likely that if the perpetrators were planning to approach Defendants, they were left without opportunity to do so. Moreover, the Government did not submit any evidence to show that Defendants knew the intentions of the perpetrators was something other than robbery.

Finally, the petitions allege that Defendants lied to Burchell by stating that they tried to wave down police officers after the shooting. In support of this allegation, Burchell testified that police officers told him that they reviewed traffic camera footage and did not see law enforcement officials patrolling the area where the shooting occurred or nearby streets at the time of the shooting. During the hearing, Defendants objected to this testimony as inadmissible hearsay. However, the Court need not resolve the hearsay issue. Even accepting that the officers did not see law enforcement officials on the traffic footage that they reviewed, the Government has not shown that the officers reviewed all pertinent footage of Defendants' route from the shooting to the hospital. As Burchell conceded during the hearing, he did not know the exact route that Defendants took to the hospital and, further, he did not personally review the traffic footage. Id. at PageID.214, 229. Thus, the Court cannot determine based on Burchell's testimony that the footage that the officers looked at was of areas matching the route that Defendants took to the hospital. The Government has not submitted sufficient evidence for the Court to conclude that it is more likely than not that Defendants lied about trying to wave down law enforcement officials.[3]

---

[3] The Court finds unpersuasive Burchell's testimony that he did not believe that Fletcher tried to wave down police officers because Fletcher would not answer Brewer's questions at the hospital. See id. at 220. According to Burchell's testimony, Defendants attempted to wave down officers

Accordingly, the Government has not shown by a preponderance of the evidence that Defendants were untruthful with their probation officer.

### B. Lack of Full Time Employment

The petitions allege that Fletcher has been unemployed since August 2019 and Hooper since November 2020. However, Burchell testified that Fletcher had informed Burchell that he was seeking employment beginning in August 2019, that Fletcher was working at a Coney Island restaurant before the pandemic and, more recently, that Fletcher was employed by a landscaping company. Id. at PageID.196. Further, Burchell testified that Fletcher is not required to affirmatively verify his employment unless directed to do so. Id. at PageID.222. Burchell's failure to verify this information does not make it more likely than not that Fletcher was not employed or seeking employment as he is required to do under the relevant condition of his supervised release.

As to Hooper, the record does not contain any affirmative evidence of his employment since being released in November 2020. However, the relevant condition requires that Hooper must either have full time employment or "must try to find full-time employment." Hooper Petition at 2. Burchell testified that Hooper informed him that he was waiting to apply for positions until he got his driver's license, which is often needed for employment applications, to attend interviews, and for transportation to work. Id. at PageID.195. The record thus contains evidence indicating that Hooper was taking steps to obtain employment. It is also worth noting, with respect to both Defendants, that obtaining full time employment over the past year was surely made more difficult, in some respects, by the advent of the global COVID-19 pandemic.

---

"just to get an escort to the hospital so they could go through red lights and stop signs and be able to get their faster." Id. at 179. Thus, it makes little sense to say that Fletcher should have been just as motivated to get the attention of an officer once he had already arrived at the hospital.

The Government has not shown that it is more likely than not that Defendants failed to obtain or, at minimum, try to obtain full time employment.

**C. Possession or Access to a Firearm**

The petitions allege that Fletcher possessed or had access to a firearm and that Hooper had access to a firearm. The crux of the Government's evidence to support these allegations is Brewer's testimony that he observed Fletcher drive to an apartment complex across from the hospital and jog away from the car and that, subsequently, police officers found two handguns in the area of the apartment complex where Fletcher had been jogging. The record casts doubt as to how much Brewer was able to see, however. For instance, Brewer testified that, when he observed Fletcher, it was dark, and Fletcher was 50 to 60 yards away from Brewer. Id. at PageID.127. Further, although Brewer thought that he saw Fletcher remain in his car after briefly leaving it, Brewer turned out to be incorrect since the car was discovered to be unoccupied when police officers later approached it. In addition, even though Fletcher's car's headlights were turned on, Fletcher jogged away from the headlights into the dark. Id. at PageID.140. Because Brewer could not see clearly, his testimony is insufficient to establish the boundaries of the area where Fletcher jogged. Given the uncertainty of the area where Fletcher jogged, it is, in turn, unclear whether the handguns were found in the vicinity of where Fletcher had been.

Moreover, other portions of Brewer's testimony support the position that Fletcher was not in possession of any firearms. For instance, Brewer testified that he did not see any weapons in the front compartment of the car while it was parked outside of the hospital's emergency ramp and Brewer was standing next to the open driver-side door looking into the car. Id. at PageID.125. Brewer also testified that he did not see Fletcher reach into the back of the car, or anywhere else,

12

before exiting the car in the apartment complex parking lot. Id. at PageID.140. When Fletcher exited the car, Brewer did not see any weapons or anything else in Fletcher's hands.

Other evidence—or lack thereof—decreases the likelihood that Fletcher was in possession of firearms. Notably, the motel's security footage shows that there was no return fire from Defendants' vehicle when they were shot at by the attackers. Finally, the Government did not produce any photographs of the handguns or where the handguns were found.

Based on the foregoing, it is at least as probable that Fletcher briefly left his car in the apartment complex to get rid of the marijuana or trash, or for some other purpose. The Government has not shown that it is more likely than not that Fletcher was ever in possession of or had access to the firearms that the police allegedly found in the apartment complex area.

Hooper's connection to the handguns that were discovered is even more tenuous. He presumably would only have had access to the firearms if the firearms had been in the vehicle at the same time Hooper was. However, as discussed above, the Government has not established that it is more likely than not that the handguns found in the apartment complex area came from the car that Fletcher and Hooper were driving. Further, the Government has not demonstrated that Hooper's unwillingness to speak with Posey proves that Hooper had access to a firearm. The Government thus has failed to show by a preponderance of the evidence that Hooper had access to a firearm.

### D. Commission of a Crime (Possession of Firearms)

The petition against Fletcher alleges that he committed a crime; specifically, that Fletcher possessed the handguns that police discovered in the apartment complex area. Fletcher Petition at 2. Because the Court has concluded that the Government has failed to show that Fletcher possessed

13

a firearm, the Court, therefore, holds that the Government likewise has failed to show that Fletcher committed the crime of being a felon in possession of a firearm.[4]

**E. Interaction or Communication with Someone Engaged in Criminal Behavior**

The petition against Fletcher alleges that he interacted or communicated with Antjuan Roby, who was arrested for a home invasion that is unrelated to the March 19 incident. Id. at 3. The petition alleges that Fletcher played a role in the home invasion. Id. However, the petition also provides that the charges against Fletcher were dropped, id., thereby raising serious questions as to what role, if any, Fletcher played in the home invasion. Without any evidence that Fletcher played a role, it is unclear on what basis the Court could find that Fletcher interacted or communicated with Roby. The petition provides no further information on the subject. Nor did the Government produce any evidence on the alleged violation during the April 30 hearing. As a result, the Government has not shown that Fletcher interacted or communicated with someone engaged in criminal behavior.

**F. Failure to Follow the Probation Officer's Instructions**

Finally, the petition against Fletcher alleges that he failed to follow Burchell's instruction to address Fletcher's outstanding traffic warrants. In support of this allegation, Burchell testified that he had "no proof" that Fletcher complied with this instruction. Hr'g Transcript at PageID.200. However, Burchell also testified that Fletcher told Burchell that Fletcher "looked into it and tried to handle it." Id. Further, Burchell acknowledged that Fletcher "could have made . . . those efforts"

---

[4] The petition against Fletcher does not allege that he committed a crime by possessing marijuana. Even if it had, the only evidence to support such an allegation is Brewer's testimony that he saw Fletcher grab something from the console of the vehicle that Brewer suspected was a bag of marijuana.

and agreed that the process of addressing outstanding traffic warrants could be difficult because of the pandemic.  Id. at PageID.226–227.

The fact that Fletcher has not cleared his outstanding warrants is not alone dispositive on the issue of whether he followed Burchell's instruction to address the warrants.  After all, Fletcher only has a certain amount of control over whether his warrants are ultimately cleared; court action is required as well.  And the pandemic has slowed court proceedings considerably.  What matters is whether Fletcher made reasonable efforts to comply with Burchell's instruction.  Fletcher told Burchell that he made attempts to handle the warrants.  Burchell's testimony that Burchell had no actual proof to support Fletcher's statement is not enough, standing alone, to show that it is more likely than not that Fletcher did not comply with the order.  Accordingly, the Government has not shown by a preponderance of the evidence that Fletcher failed to comply with Burchell's instruction to address the outstanding traffic warrants.

### III.  CONCLUSION

For the foregoing reasons, the Government has not met its burden to show that Defendants violated the conditions of their supervised release.  The petitions are, therefore, dismissed.  Defendants are to be immediately released.  Supervised release for both Defendants shall continue, as previously ordered.  Fletcher's motion to dismiss two of the alleged violations of his supervised release is denied as moot (No. 17-20156, Dkt. 41).

SO ORDERED.

Dated:  May 25, 2021                                             s/Mark A. Goldsmith
   Detroit, Michigan                                              MARK A. GOLDSMITH
                                                                          United States District Judge

15